IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY D. BURNETTE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 01-2481 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.  INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Anthony D. Burnette and Defendant
Michael J. Astrue, Commissioner of Social Security.  Plaintiff
seeks review of a final decision by the Commissioner denying his
claim for disability insurance benefits ("DIB") under Title II of
the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  Pursuant to the
discussion which follows, Plaintiff's motion is denied and
Defendant's motion is granted.

### II.  BACKGROUND

#### A.   Factual Background

Anthony D. Burnette worked intermittently as a line cook,
landscape laborer, and roofing laborer for several years until
November 20, 1997.  According to Plaintiff, except for two brief
attempts to work as a cook in 1998, he was unable to maintain full
time employment after that date due to a combination of chronic

obstructive pulmonary disease[1] ("COPD"), asthma, osteoporosis, arthritis, degenerative bone disease, an abdominal hernia, and three herniated discs in the lumbar region of his back. (Certified Copy of Transcript of Proceedings before the Social Security Administration, "Tr.," Docket No. 10, at 143.)

B.  Procedural Background

On June 28, 2000, Mr. Burnette protectively filed for disability insurance benefits and for supplemental security income benefits ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Both applications were initially denied on January 23, 2001 (Tr. 5; 110-111), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on February 28, 2001. (Tr. 116.)

On September 19, 2001, a hearing was held before the Honorable James J. Pileggi at which Plaintiff was represented by counsel. Judge Pileggi issued his decision on October 26, 2001, again denying DIB and SSI benefits. (Tr. 27-38.) The Social Security Appeals Council chose not to review the decision[2] and thus, the

---

[1] The phrase "chronic obstructive pulmonary disease" refers to a group of lung diseases that cause swelling of the airways, the most common of which are emphysema and chronic bronchitis.  Symptoms of COPD include shortness of breath (dyspnea) persisting for months to years, wheezing, decreased exercise tolerance, and cough with or without phlegm.  *See* on-line medical encyclopedia at www.mercksource.com, last visited June 12, 2007.

[2] Usually, the next step in the administrative procedure would be for the Social Security Appeals Council to reconsider the ALJ's decision to determine if there had been an error of law or abuse of discretion on his part.  In selected test cases, however, this review

October 26, 2001 opinion became the final decision of the Commissioner. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on December 28, 2001, seeking judicial review.

After a briefing schedule had been set, the Commissioner of Social Security filed an unopposed motion for voluntary remand to further consider the decision; the motion was granted on April 10, 2002. Upon remand, the Appeals Council returned the matter to Judge Pileggi (Tr. 123-124) and on September 25, 2002, a second hearing was held, at which Plaintiff was again represented by counsel. (See transcript of hearing at Tr. 43-84.) In a decision dated March 28, 2003, Judge Pileggi determined that Plaintiff had become disabled as of July 12, 2002, due to a combination of COPD and vascular necrosis of his left hip, and was therefore eligible for supplemental security income as of that date. However, because he was not disabled prior to his date last insured,[3] i.e.,

---

step has been omitted. See 20 C.F.R. § 404.966 and § 416.1466. Plaintiff filed an appeal (Tr. 118), but the record does not include any correspondence indicating that the Appeals Council informed him to directly appeal to a federal district court. However, neither party objects to the procedures followed herein.

[3] A person is eligible for supplemental security income benefits if he is "disabled" (as that term is defined elsewhere in the regulations) and his income and financial resources are below a certain level. 42 U.S.C. § 1382(a). To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a). The parties do not dispute that Mr.

September 30, 2000, he was not entitled to a period of disability and disability insurance benefits. (Tr. 22.)

On October 10, 2006, Defendant moved without objection to re-open the case so that the second denial of benefits could be litigated on its merits. (*See* Doc. No. 6.)

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence,

---

Burnette satisfied the first two prongs of the DIB test and thus, with regard to his eligibility for DIB, the only issue before the Court is whether he became disabled prior to September 30, 2000.

that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  LEGAL ANALYSIS

### A.  The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that he has a medically

5

determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional

---

[4]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5]   The same test is used to determine disability for purposes of receiving either type of Social Security benefits.  Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both SSI and DIB applications.

capacity[6] ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Pileggi first concluded that Mr. Burnette had not engaged in substantial gainful employment since alleging disability on November 20, 1997. (Tr. 17.) Resolving step two in Plaintiff's favor, the ALJ found that as of the date of the hearing, he suffered from musculoskeletal pain, COPD, and vascular necrosis of his left hip, all of which were "severe" as that term is defined in the Social Security regulations. He further determined that although Mr. Burnette had undergone a hernia repair in August 2000, the procedure was

---

[6] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. 20 C.F.R. § 416.945.

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

uneventful and would not have resulted in any significant limitations. (Tr. 19.) Similarly, although Plaintiff had also been evaluated multiple times for possible cardiac-related impairments, the relevant medical evidence did not reflect any abnormalities which would preclude all substantial gainful activity. (Id.)

At step three, the ALJ concluded that Plaintiff's impairments, taken alone or in combination, did not satisfy any of the criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 1.00 Musculoskeletal System or 3.00 Respiratory System. (Tr. 18.) At step four, the ALJ appears to have concluded[8] that based on the medical evidence of record, Mr. Burnette did not retain the RFC to perform any of his previous work which Karen E. Krull, the vocational expert ("VE") who testified at the hearing, classified as medium or heavy semi-skilled or unskilled work. (Tr. 77-78.)

In response to the ALJ's hypothetical questions, Ms. Krull stated that there were numerous light, unskilled jobs such as cashier, information clerk, or mail clerk which an individual of Mr. Burnette's age, education, and physical/mental limitations could perform in the local or national economy. (Tr. 79-80.) At the sedentary level, Plaintiff retained the RFC to work as a

---

[8] Although the ALJ made no explicit finding in this regard as required at step three, it is clear that he found Plaintiff unable to return to his previous occupations since he continued the analysis through steps four and five.

cashier, information clerk, or alarm monitor.  (Tr. 80-81.)

Therefore, based on Plaintiff's status as a younger individual[9] with a ninth-grade (i.e., "limited") education, a work history of semi-skilled and unskilled occupations which did not provide transferrable skills, Mr. Burnette's testimony at the hearing, and the medical evidence of record, the ALJ determined at step five that until July 12, 2002, Mr. Burnette could perform sedentary work which did not involve exposure to smoke, dust, fumes, or other irritants in the air which could aggravate his respiratory problems and did not require the use of foot controls. As of that date, however, due to vascular necrosis of his left hip in combination with his other impairments, Plaintiff's condition had deteriorated to the point he was unable to perform any substantial gainful activity on a sustained basis.  (Tr. 20-21.) Consequently, Mr. Burnette was entitled to supplemental security income benefits as of July 12, 2002.  Because his insured status for purposes of disability insurance benefits expired as of September 30, 2000, prior to the date on which he was found to be disabled, he was not entitled to those benefits.  (Tr. 21.)

B.   Plaintiff's Arguments

Plaintiff raises two arguments in support of his position that the ALJ erred by concluding that he did not become disabled

---

[9]  Plaintiff was 34 years old at his alleged disability onset date and almost 39 at the time of the second hearing, making him a "younger" person according to Social Security regulations.  20 C.F.R. § 404.1563(c) and § 416.963(c).

until July 12, 2002.  First, under the well-established "treating physician rule," the ALJ erred by giving greater weight to the opinion of a one-time consultative examiner than to the opinions of his long-term treating physicians.  (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 22, "Plf.'s Brief," at 7-8.)  Secondly, the ALJ erred when he found that Plaintiff was capable of performing sedentary work because he failed to consider his inability to sit for prolonged periods. (Id. at 9-10.)  We address each of those arguments in turn.

     1.   *The ALJ's failure to properly weigh the opinions of Plaintiff's treating physicians as compared to that of a one-time consultative examiner.*  Plaintiff correctly states that under the well-established treating physician rule,[10] "a cardinal principle" in disability determinations is that the ALJ must "accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time."   (Plf.'s Brief at 7, *quoting* Morales, 225 F.3d at 317.)  Plaintiff argues

_____

[10]   Social Security regulations identify three general categories of medical sources – treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources.  A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source.   Non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.   20 C.F.R. § 404.1502.

10

that the ALJ rejected the findings of his treating physicians - Dr. Daniel Wilson and Dr. Forrest Henry - in favor of the findings of Dr. Jawahar N. Suvarnakar, a one-time consultative physician. (Id. at 7-8.) According to Mr. Burnette, this Court should recognize the conclusions of Drs. Wilson and Henry that he was disabled as of November 20, 1997, and award benefits or, at a minimum, the case should be remanded for a more detailed explanation of the weight assigned to the various physicians' opinions. (Id. at 8.)

Social Security regulations carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered. Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); see also Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266 n7. The opinions of a treating source are given

11

controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

Although Plaintiff concentrates his argument on a claim of disability before his date last insured and, consequently, his entitlement to disability insurance benefits, the Court has reviewed the entire medical record in order to ascertain if the ALJ may have erred by failing to recognize that Mr. Burnette was eligible for supplemental security benefits between September 30, 2000, and July 12, 2002. We note initially that although Plaintiff alleges that he became disabled as of November 20, 1997, the earliest medical records date from June 14, 2000. At the second hearing, Plaintiff implied that he had been treated prior to that date. *See*, for instance, his reference to a diagnosis of rheumatoid arthritis made in 1998 or 1999 on the basis of an "MRI or CAT scan, one of the two." (Tr. 52.) At the first hearing on September 19, 2001, he testified that his COPD began to get worse "a little bit before" November 20, 1997, in that he "was breaking out in heavy sweats. They [sic] were concerned that I might have a bad heart or a bad valve, but then after they did the first CT of my lungs, they found a severe defect in my left lung, I believe it was." (Tr. 97-98.) He also testified that Dr. Wilson had

prescribed a rescue inhaler in 1998.  (Tr. 99.)

While the ALJ has the duty to be sure that the medical record is complete, the ultimate responsibility for proving disability through medical evidence rests with the claimant.  See 20 C.F.R. § 416.912(c), stating that the claimant must provide medical evidence showing that he had an impairment(s) and its severity during the time he claims to have been disabled, how the impairment(s) affect his functioning during that time, and any other information the Social Security Administration ("SSA") needs to decide the claim.  The responsibility of the SSA is to make reasonable efforts to help the claimant get medical reports in order to develop the claimant's medical history for at least the 12 months preceding the month in which an application for benefits is filed unless there is reason to believe development of an earlier period is necessary or unless the claimant states that disability began less than 12 months before filing for benefits.  20 C.F.R. § 416.912(d).

At both hearings, the ALJ asked Plaintiff's counsel if the medical record was complete and allowed them[11] the opportunity to

_____

[11]  Plaintiff was represented by different attorneys at the first and second hearings.  By comparing the opinions issued on October 26, 2001, and March 28, 2003, the Court concludes that the medical evidence considered by the ALJ in both those instances was essentially unchanged except for the addition of records from Dr. Henry for the period June 28, 2001 through August 12, 2002, and those of Dr. Barry Hootman dating from October-November 2002.  These records thus pertain to a period beginning approximately nine months after Plaintiff's date last insured.

13

supplement the record based on testimony received at the hearings. In both instances, counsel stated that the record was complete. (*See* Tr. 87-88 re: first hearing and Tr. 46-47, 54, 65-67, and 83 re: second hearing.)

Where a claimant is represented by counsel, the ALJ's duty to develop the record is less than when the claimant is acting pro se. *See* Mayes v. SSA, No. 05-5055, 2006 U.S. App. LEXIS 19475, *7 (3d Cir. Aug. 2, 2006), *citing* Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). Plaintiff does not contend that the ALJ erred by failing to develop a full and fair record; in fact, he fails to acknowledge in his brief in support of the motion for summary judgment that there are no medical records to support his claim of disability beginning in November 1997.  Therefore, even if the Court were to determine that the ALJ erred elsewhere in his analysis, there is no medical evidence to support a claim of disability prior to June 14, 2000.

On June 14, 2000, Dr. Daniel Wilson completed a report for the Pennsylvania Department of Public Welfare indicating that in order to sustain employment and/or work in any capacity, Mr. Burnette required an albuteral inhaler for his asthma and COPD. (Tr. 174.)  He also indicated that Mr. Burnette was temporarily disabled, i.e., from June 22, 2000, through September 30, 2000. (Tr. 175.)  Even if the Court were to credit Dr. Wilson's evaluation of Mr. Burnette's inability to work and the fact that

14

Plaintiff was considered disabled by the Department of Public Welfare (see Tr. 77, testimony to that effect), the determination by another agency that a claimant is disabled is not binding on the Social Security Administration.  20 C.F.R. § 416.904.

Mr. Burnette was treated as an outpatient at the Clarion Hospital on June 29, 2000, after he complained of shortness of breath, headaches, chest pain, and an on-going cough.  (Tr. 184.) A cardiac stress test revealed a normal heart rate and pressure, with an exercise tolerance at the upper limit of the "fair" range. (Tr. 185.)  His medical history at that point noted pneumonia three years previously, chronic bronchitis, asthma since birth, a family history of lung disease, and shortness of breath for the past two or three years which was worse with exertion.   (Tr. 187.)   The summary pulmonary function report indicated obstructive pulmonary impairment with a moderate functional impairment, a "significant component" of airway obstruction which could be reversible, air trapping secondary to the obstructive process, an overly distended lung, and severe diffusion defect.  (Tr. 191.)   Thus, Plaintiff's contention that Dr. Wilson identified a "severe defect" in his left lung as early as 1997 is contradicted by the medical record which shows the problem was apparently not discovered until mid-2000.[12]

At Dr. Wilson's direction, Mr. Burnette underwent an MRI at

---

[12]  Plaintiff's reference to these diagnoses in 1997 is also contradicted by his own report that his first appointment with Dr. Wilson was on June 22, 2000.  (Tr. 145.)

Clarion Hospital on July 24, 2000, because of severe pain in the cervical and lumbar regions. The MRI of his lumbar spine revealed a "moderate size central focal disc herniation at L3-L4 and L4-L5" while the MRI of the cervical spine showed "no sizeable focal disc herniation or significant cervical spinal canal stenosis." (Tr. 192.)

Dr. Daniel A. Wecht, a neurologist with the UPMC Health System, examined Mr. Burnette on September 13, 2000. He reported to Dr. Wilson that on examination, Plaintiff had some "mild tenderness along the lower back in the paraspinal muscles," but motor and sensory evaluations demonstrate that he was "grossly intact." His overall impression was that although Plaintiff had chronic low back pain, there were no objective neurological findings and that he had mild disc protrusions as shown in the earlier MRI. "Aggressive" physical therapy and conditioning and an aggressive weight loss program were recommended in lieu of surgery in order to reduce stress on his lower back. Finally, it was "absolutely critical" that he cease smoking because smoking was "clearly associated with degenerative arthritic change and degenerative disc disease." (Tr. 196-197.)

The only other evidence pertaining to Dr. Wilson is a report of a contact between the SSA and the doctor dated November 21, 2000, in which Dr. Wilson stated that Mr. Burnette had told him he had been "injured" during the consultative exam by Dr. Suvarnakar.

16

(Tr. 205.)  While Dr. Wilson noted muscle spasm throughout Plaintiff's spine which could result from deep palpation of the muscle structure, he did not observe any bruising or marks on his back.  He also noted that "while Mr. Burnette may be uncomfortable, the condition is considered minor," and Mr. Burnette had no future appointments scheduled with him.  (Id.)  In fact, this report from November 2000 is the last mention of Dr. Wilson in the record.

At the direction of the SSA, Plaintiff underwent a consultative physical examination by Dr. Suvarnakar on November 6, 2000.  Dr. Suvarnakar also noted that Plaintiff was a heavy smoker, "with 2 or 3 packs [a day] for the last 25 years."  (Tr. 199.) Plaintiff reported to Dr. Suvarnakar that he had been in a motor vehicle accident in late 1997, resulting in vertebral fractures at L3, L4, and L5 levels, along with a possible hip fracture and sternal fractures.  He was not hospitalized and no major investigative work-up was done following the accident.  Plaintiff claimed that since the accident he had experienced chronic back pain, stiffness and pain in his left hip and knee.  (Id.)  On examination, Mr. Burnette's lungs were "clinically clear, except for occasional expiratory wheeze."  (Id.)  Dr. Suvarnakar also noted a normal cervical spine with full range of motion and lumbar spine with 70 to 80 degrees of flexion, 20 degrees of extension, and 10 to 15 degrees of lateral rotation.  He concluded that Mr. Burnette was limited to lifting or carrying no more than 20 pounds

17

frequently and one to two hours of standing and walking per day. There was no limitation on sitting although he noted Plaintiff's report of discomfort with "prolonged" sitting.  (Tr. 201.)  His ability to use his lower legs to push or pull was also limited due to lumbar pain.[13]  (Id.)

Dr. John Brooks saw Plaintiff on one occasion, January 29, 2001.  (Tr. 220.)  At that time, he noted prior diagnoses of allergies for "years," COPD for three years, and heartburn for one year.  Dr. Brooks' diagnoses were chronic pain secondary to discogenic disease, COPD and hyperlipidemia.  He scheduled Mr. Burnette for a bone scan of his entire body which was conducted on January 31, 2001.  The scan revealed "minimal arthritic change in the knees and hips with the remainder of the appendicular and axial skeleton essentially negative.  Special attention to the entire vertebral column fails to reveal any abnormalities."  (Tr. 221.)

Dr. Forrest E. Henry began treating Plaintiff on June 28, 2001.  (Tr. 231.)  At that time, Plaintiff reported chest pain, a

---

[13]  The record contains additional reports from 2000-2001. On August 7, 2000, Mr. Burnette was admitted to the Clarion Hospital for repair of an incarcerated ventral hernia above the umbilicus.  (Tr. 178-179.)  The surgery and Mr. Burnette's recovery were unremarkable.  (Tr. 180-183.)  A non-examining consultative physician also completed a psychiatric review technique form on December 20, 2000, which showed no medically determinable mental impairment.  (Tr. 206-218.)  A Residual Functional Capacity Assessment by an unidentifiable person was prepared on December 6, 2000, and reviewed on January 16, 2001. (Tr. 220-227.)  Plaintiff raises no arguments based on these medical reports and the Court finds no reason to further address them.

18

history of COPD with increasing shortness of breath, and tenderness
in the right upper quadrant of his abdomen. (Tr. 239.) Dr. Henry
noted rhonchi and wheezes throughout his lungs, which he described
as "a mess." He ordered a number of drugs for these conditions, an
EGD,[14] and a cardiac consultation by Dr. Glenn Miller. (Id.)

Examination of Mr. Burnette's lungs on July 20, 2001, revealed
that they were clear to auscultation bilaterally and his
cardiovascular examination revealed a regular rate and rhythm.
Because of the "anginal-like" symptoms Plaintiff had experienced
for the previous several weeks and a strong family history of
coronary disease, Dr. Miller recommended that he undergo a
diagnostic cardiac catherization (Tr. 237-238), but the Court can
find no results of such a procedure in the record.

Dr. Henry continued to treat Plaintiff on a regular basis. In
July and August 2001, he reported that with new drug regimens he
was "doing a little better." (Tr. 235-236.) On September 19,
2001, he wrote that he was treating Mr. Burnette for severe COPD,
chest pain and right upper quadrant pain. Plaintiff was described
as "always very short of breath even with [activities of daily
living]." Dr. Henry concluded:

Anthony's work up is still not completed, but based on

_____

[14] An EGD or esophagogastroduodenoscopy is an examination of the
lining of the esophagus, stomach, and upper duodenum with a small
camera (flexible endoscope) which is inserted down the throat. See the
National Institute of Medicine's on-line website, Medline Plus, at
www.nlm.nih.gov/medlineplus/druginfo (last visited June 12, 2007.) The
Court could identify no medical records related to such a test.

physical exam and the testing already completed, I see absolutely no way Anthony could hold any meaningful employment.

(Tr. 231.)

By November, 2001, Dr. Henry reported that Mr. Burnette was "falling apart on me," with increased coughing, wheezes and rhonchi throughout his lungs. (Tr. 250.) In December, his lungs were clear to auscultation bilaterally but he had increased arthritic and "musculoskeletal type pain." (Tr. 249.)

On January 3, 2002, Mr. Burnette consulted with Dr. Lewis C. Kline, a pulmonologist, who noted that Mr. Burnette was coughing profusely, with both wheezing and rhonchi on physical examination, and moderate airflow obstruction. (Tr. 268-269.) Plaintiff reported extreme shortness of breath after even such minimal exertion as walking 12 steps on a flat surface. Dr. Kline also noted that Plaintiff continued to smoke "at least 2 to 2 1/2 packs of cigarettes per day." (Tr. 268.) He ordered sleep apnea studies, a repeat CT scan of his lungs and liver, and increased his breathing medication. (Tr. 269.) A chest x-ray on January 4, 2002, revealed some hyperinflation of his lungs but the heart and pulmonary vasculature were normal and there were no localized infiltrates. The high resolution CT scan showed no evidence of pulmonary infiltrates or pleural effusions, very minimal bronchial wall thickening, and questionable attenuation of the vasculature in the outer zones of the lungs. The CT scan ruled out bronchiectasis

and acute parencymal disease, but disclosed apical blebs[15] and mild
bronchitis.  An echocardiogram performed the same day revealed no
abnormal conditions of the heart.  (Tr. 273.)  Although Dr. Kline
stated that he would see Mr. Burnette again after those studies
were complete,[16] there is no record of him having done so through
the date of the second hearing on September 25, 2002.

In February 2002, Dr. Henry noted increased back and hip pain,
along with diminished and coarse lung function with wheezing.  He
ordered x-rays of Plaintiff's hips, lumbar spine and neck.  (Tr.
247.)  In April 2002, he noted that Plaintiff was "doing fairly
well" and "other than his neck, everything seems to be getting
better."  (Tr. 244.)  His lungs were again clear bilaterally and
the x-ray of his cervical spine had been normal.  (Tr. 244.)  In
May, Plaintiff reported pain on his right side and above his right
hip for 1 or 2 weeks, together with severe neck pain and spasms.
His lungs were clear but he evinced pain in the lumbar spine and in
the right hip and abdominal areas.  (Tr. 243.)  On June 24, 2002,
Dr. Henry did not mention his hip, back or neck pain, but did note
that his lungs were diminished but clear.  (Tr. 242.)  He continued

---

[15]  Bronchiectasis is the chronic inflammatory or degenerative
condition of one or more bronchi or bronchioles marked by dilatation
and loss of elasticity of the walls.  Parencymal disease refers to
disease occurring in the essential and distinctive tissue of an organ
as distinguished from its supportive framework.  Apical blebs are
blister-like formations in the superior part of an organ.  See Medline
Plus (last visited June 12, 2007.)

[16]  Plaintiff was scheduled for a sleep study at Butler Memorial
Hospital on April 1, 2002, but failed to appear.  (Tr. 287.)

21

to treat Plaintiff through at least October 10, 2002.[17]

In addition to the medical record, the ALJ is directed to consider the claimant's activities of daily living ("ADLs"), his testimony, and his work history. The ALJ noted that as of September 13, 2000, Mr. Burnette's ADLs were not significantly diminished; that is, he could care for his personal needs, help with household tasks, mow the lawn on a riding mower, and carry trash bags weighing 10 to 15 pounds even though these activities were affected by his COPD, asthma, and lower back pain, and by environmental conditions such as heat, humidity, pollen. (Tr. 164-171.) Second, the ALJ noted that Mr. Burnette's lifetime work record was "not a particularly good one . . . calling into question [his] motivation and desire to engage in regular and sustained employment irrespective of his health status." (Tr. 20.) Third, at the hearing, Plaintiff described his pain as of September 2000 as a four or five on a scale from one to ten, without medication. (Tr. 71-72; 74.) He also reported that he had three or four days a week at that time when he could not get out of bed due to his breathing difficulties (Tr. 73), a limitation which is mentioned neither in his ADL questionnaire nor in any of the medical records

---

[17] Although Dr. Henry's notes for the period July 12 through October 10, 2002, pertain to a period for which Plaintiff had been declared disabled, the Court has reviewed the notes to determine if they offer any retrospective analysis of his condition. (See Tr. 240, 245, 251-255, 302-305.) Similarly, we have reviewed but not discussed Dr. Barry Hootman's notes from October-November 2002 (Tr. 307) since they date from well after Plaintiff was awarded benefits and offer no insight into his condition prior to July 12, 2002.

22

dating from that period.

Having reviewed the medical record in its entirety, the Court
agrees with the ALJ that there is no substantial evidence to
support a conclusion that between November 20, 1997, and July 12,
2002, Mr. Burnette could not perform sedentary work which did not
expose him to smoke, dust, fumes or other irritants which could
aggravate his COPd and asthma and which did not involve use of foot
controls due to the impairment of his lumbar spine and hips.   The
Court also notes, as did the ALJ (Tr. 17), that despite his COPD
and asthma, Plaintiff admitted at the September 2002 hearing that
he continued to smoke cigarettes at the rate of 1 to 1 1/2 packs
per day. (Tr. 51.) Although this is a decrease from his 2-3 packs
a day in late 2000 (see reports by Drs. Suvarnakar and Wecht) and
2 to 2 1/2 packs in January 2002 when he was examined by Dr. Kline,
he had been told by Dr. Wecht in September 2000 that it was
"absolutely critical" that he stop smoking.   Although Plaintiff
testified that he was "trying" to stop smoking (Tr. 51), there is
no evidence that Plaintiff took any drugs or undertook other
therapy to help him stop.   The medical literature is unequivocal
that the leading cause of COPD is smoking and the disease continues
to worsen if smoking is not terminated.   (See the on-line medical
encyclopedia at www.mercksource.com, last visited June 12, 2007.)
With a few exceptions clearly not applicable here, a claimant's
failure to follow treatment prescribed by a physician which can

23

restore his ability to work will result in the SSA finding that the claimant is not disabled.  20 C.F.R. § 404.1530.

Finally, we turn to Dr. Henry's comment of September 19, 2001, that he could see "absolutely no way Anthony could hold any meaningful employment."  While it is true that opinions (even by treating sources) that an individual is disabled and unable to work are not entitled to controlling weight or special significance (*see* 20 C.F.R. §§ 404.1520(a) and 416.927), it does not mean that such opinions are to be rejected in their entirety.  Social Security Ruling ("SSR") 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," states: "[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored."[18]  Here, the ALJ explicitly noted Dr. Henry's opinion but rejected it on the grounds that it was not supported by the weight of the medical evidence, including his own records up to that point and through at least April 11, 2002.  (Tr. 19-20.)  The Court agrees that Dr. Henry's opinion was not entitled to great, much less controlling

---

[18]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  <u>Sykes</u>, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1).  "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  <u>Sykes</u>, <u>id.</u>, *quoting* <u>Heckler v. Edwards</u>, 465 U.S. 870, 873 n3 (1984).

weight, because that opinion was proffered less than three months after he began treating Mr. Burnette. *See* <u>Morales</u>, 225 F.3d at 317, noting that great weight should be given to ""expert judgment based on a *continuing* observation of the patient's condition *over a prolonged time*" (emphasis added); *see also* 20 C.F.R. § 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." The ALJ did not reject Dr. Henry's opinion outright, but rather gave it the reduced weight which it was due.

Because there is no medical or other evidence to support the conclusion that prior to July 12, 2002, Plaintiff's other impairments, i.e., degenerative disc disease of his cervical and lumbar spine and vascular necrosis of his hip, were severe enough to preclude even sedentary work, we find no reason to reject the ALJ's conclusion that Plaintiff was not disabled until that date.

2.   *The ALJ erroneously failed to recognize Plaintiff's impaired ability to sit for prolonged periods of time.* Plaintiff argues that the hypothetical questions posed by the ALJ to the Vocational Expert were flawed in that they failed to reflect all of his impairments. (Plf.'s Brief at 9, *citing* <u>Burns v. Barnhart</u>, 312 F.3d 113, 123 (3d Cir. 2002).) The ALJ's determination that Mr. Burnette could perform a range of sedentary work is not supported by substantial evidence, he claims, because the

hypothetical questions did not take into account the fact that he was unable to sit for prolonged periods of time.  (Id.)

In support of this argument, Plaintiff relies on Dr. Suvarnakar's notes indicating he could sit without limitation but was "uncomfortable with prolonged sitting."   (Tr. 198-202.) Plaintiff argues that this report was substantiated by an MRI performed on July 24, 2000, which revealed two moderate-size disc herniations and abnormalities on the left inferior pubic ramus. (See Tr. 192-193.)    Plaintiff further argues that the ALJ erroneously ignored SSR 83-12, "Capability to Do Other Work - The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations within a Range of Work or between Ranges of Work," which directly addresses the situation where a claimant is unable to sit for the six hours per eight-hour work day anticipated in sedentary job descriptions.  (Plf.'s Brief at 9-10.)

The Court is not persuaded by this argument.  At no point in Dr. Suvarnakar's notes does he define "prolonged," and this comment appears to be based strictly on subjective reports by Mr. Burnette. Dr. Wecht also mentioned Plaintiff's reported difficulty with "prolonged sitting in a single position," but described the disc protrusions as "mild" and opined that weight loss, aggressive physical therapy, and smoking cessation would improve his changes for recovery.   (Tr. 197-198.)    None of the other doctors who treated Plaintiff between June 2000 and July 2002 mention such a

limitation, including Dr. Henry who provided the most consistent treatment over the longest period of time, nor is it mentioned in Plaintiff's ADL questionnaire. He had not undergone surgery on his back or emergency treatment (Tr. 53), and there is no evidence of weight loss, smoking cessation, or physical therapy as suggested by Dr. Wecht.[19] At the first hearing on September 19, 2001, Plaintiff testified, "I can't sit still. It's hard for me to sit still for any long period of time. I got to get up and move around, walk around a little bit, try and, you know, ease my back pain up." (Tr. 103.) He later testified that he could sit "probably 20, 30 minutes or so," before he had to stand up and "move around a little bit." (Tr. 106.) At the second hearing, he testified that in September 2002, he could sit for 10 to 15 minutes without having to stand up, in September 2001, he could sit for 40 minutes to an hour (in contradiction to his statement at the first hearing), and in September 2000, he could sit for "a couple hours." (Tr. 59.)

The lack of objective medical evidence regarding Plaintiff's inability to sit for prolonged periods of time logically leads to the conclusion that this limitation is based only on Plaintiff's own statements. Determining the credibility of those statements is the provenance of the ALJ who has the best opportunity to assess the claimant's demeanor. Reefer v. Barnhart, 326 F.3d 376, 380 (3d

---

[19] Mr. Burnette was evaluated for rehabilitative physical therapy in July 2002 (Tr. 279-281), but the program was delayed because heat during the interview apparently created breathing problems. (Tr. 290.)

27

Cir. 2003). In both decisions, Judge Pileggi concluded that Plaintiff's statements concerning his impairments and their impact on his ability to work were not entirely credible. (Tr. 21; 37.) In particular, in the second decision, the ALJ distinguished Plaintiff's allegations about his current condition – which were consistent with the medical evidence – from allegations about his condition prior to July 2002, the medical evidence from that period, Mr. Burnette's reports of his daily activities, and the lack of motivation for full time work inferred from his prior work record.[20] Where an ALJ's reasons for discounting subjective

_____

[20] SSR 96-7p, "Evaluation of Systems in Disability Claims: Assessing the Credibility of an Individual's Statements," clearly describes how the ALJ is to weigh a claimant's subjective complaints of pain, fatigue, shortness of breath, weakness, or nervousness and assess the claimant's credibility with regard to those complaints. In brief, a claimant's description of his physical or mental symptoms is not sufficient in itself to establish disability. Rather, the ALJ must first ascertain if there is an underlying medically determinable impairment which could reasonably be expected to produce the pain or other symptoms. Once such a condition is identified, the ALJ must evaluate the intensity, persistence, and effects of the claimed symptoms to determine the extent to which they limit the individual's ability to do basic work activities. In this second step, the ALJ must determine the credibility of the claimant's statements based on consideration of the entire record, including medical signs and laboratory findings, the claimant's statements, and information provided by medical sources or other persons regarding the symptoms and how they affect the individual. *See also* 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). The regulations further note that an individual's symptoms "can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." In those circumstances, the ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of medication(s) the individual takes to alleviate the symptoms; treatment other than medication received to relieve pain, and any other factors concerning the individual's functional limitations and restrictions due to the symptoms. Id.

28

statements is "reasonable, specific, and based on the evidence," his determination of credibility is to be afforded "'strong deference.'" Smith v. Comm'r of Soc. Sec., No. 03-1266, 2003 U.S. App. LEXIS 22966, *2-*3 (3d Cir. Nov. 7, 2003), quoting N.L.R.B. v. Permanent Label Corp., 657 F.2d 512, 518 (3d Cir. 1981).

"'While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" Burns, 312 F.3d at 122, quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984); see also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." Burns, id. at 123, citing Podedworny, 745 F.2d at 218. Here, no medical evidence supports claimant's subjective complaints of an inability to sit for prolonged periods of time and this Court defers to the credibility finding of the ALJ on that issue. The omission of this alleged limitation from the hypothetical question can not be said, therefore, to have been error on the part of the ALJ.

Having concluded that the ALJ did not err in his decision that Plaintiff became disabled from even a limited range of sedentary

29

work no earlier than July 12, 2002, the Court denies the motion for summary judgment by Plaintiff and grants the motion by Defendant. An appropriate order follows.

June  _10_ , 2007

_William L. Standish_
William L. Standish
United States District Judge

cc:  Counsel of Record

30